_____

**No. 13-2085**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**CASSENS TRANSPORT COMPANY,**

**Appellant,**

**v.**

**JOYCE LEWIS, ET AL.**

**Appellees.**

**On Appeal From The United States District Court
For The District of Maryland**

---

**BRIEF OF APPELLEES**

---

Ray M. Shepard, Esquire
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
410-821-0070 (Phone)
410-821-0071 (Facsimile)
rshepard@sgs-law.com

*November 18, 2013*                    *Attorney for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2085__    Caption: __Cassens Transport Company v. Joyce Lewis, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Joyce Lewis, et al.__
(name of party/amicus)

_____

who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date:    11/18/2013

Counsel for: Joyce Lewis, et al., Appellees

## CERTIFICATE OF SERVICE
****************************

I certify that on  November 18, 2013  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

C. Edward Hartman, III
Hartman and Egeli, LLP
116 Defense Highway, Suite 300
Annapolis, MD 21401
ed@hartmanegeli.com

Amy Lorenz Moser
Armstrong Teasdale, LLP
7700 Forsyth Blvd, Suite 1800
St. Louis, MO 63105
alorenzmoser@armstrongteasdale.com

_____
(signature)

11/18/2013
(date)

## TABLE OF CONTENTS

**STATEMENT OF JURISDICTION** …………………………………………... 1

**STATEMENT OF THE CASE** …………………………………………… 4

**STATEMENT OF THE FACTS** …………………………………………...… 5

**SUMMARY OF THE ARGUMENT** ………………………………………… 10

**ARGUMENT** ………………………………………………………………... 12

    **A. As a Preliminary Matter, the Fourth Circuit Court of Appeals Does Not Have Jurisdiction to Hear Cassens' Appeal**………………………………………………………………... 12

    **B. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because the 100-Mile Rule Does Not Apply**………………………………………………....12

    **C. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because Compliance with the Subpoena and Order Does Not Impose an Undue Burden on Cassens**………………………………………………………... 17

        **1. Cassens' Claims of Undue Burden Fall Short**…………………… 17

        **2. Any Undue Burden Claimed by Cassens is Significantly Outweighed by Appellees' Need for the Information to be Obtained from the Test Load**……………… 21

        **3.** *Kostelecky v. NL Acme Tool/NL Industries, Inc.* **and** *In re Automotive Refinishing Paint Antitrust Litigation* **are Inapposite**………………………………………… 24

        **4. Judge Nickerson's Decision to Not Make Appellees' Reimburse Cassens for the Costs Associated with the Test Load is Not an Abuse of Discretion**………………………... 25

**D. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because Rule 34 Clearly Contemplates the Test Loading Sought by Appellees**....................... 28

**CONCLUSION** ........................................................................ 30

**REQUEST FOR ORAL ARUGMENT** .................................................. 31

**CERTIFICATE OF SERVICE** ...................................................... 31

**CERTIFICATE OF COMPLIANCE** ................................................... 31

**ADDENDUM** ........................................................................ 32

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Alexander v. United States,*
    201 U.S. 117 (1906) …………………..……………………………… 2

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,*
    262 F.R.D. 293 (S.D.N.Y. 2009)…………………………………..…...15, 16

*BNLfood Invs. Ltd. SARL v. Martek Biosciences Corp.*,
    2012 U.S. Dist. LEXIS 104941 (D. Md. July 27, 2012) ...… …………14, 15

*Church of Scientology of Ca. v. United States,*
    506 U.S. 9 (1992) ………………………………………………….. 2, 3

*Cobbledick v. United States,*
    309 U.S. 323 (1940) ………………………………………………….. 1, 2

*In Re Air Crash Disaster at Sioux City*,
    1991 U.S. Dist. LEXIS 10372 (N.D. Ill. July 26, 1991)………………..28, 29

*In Re Automotive Refinishing Paint Antitrust Litig.*,
    229 F.R.D. 482 (E.D. Pa. 2005) ………………………………………24, 25

*In Re Motorsports Merch. Antitrust Litig.*,
    186 F.R.D. 344 (W.D. Va. 1999) ….. …………………………………..14

*Kostelecky v. NL Acme Tool/NL Indus., Inc.*,
    837 F.2d 828 (8th Cir. 1988) ...…………………………….…...............24

*M'Baye v. New Jersey Sports Production, Inc.*,
    246 F.R.D. 205 (S.D.N.Y. 2007)…..……………………………..........16

*Perlman v. United States*,
    247 U.S. 7 (1918) ………………………………………………….. 2, 3, 4

*Reich v. Nat'l Eng'g & Contracting Co.*,
    13 F.3d 93 (4th Cir. 1993) ..……………………………………....……… 1

*Rosenruist-Gestao E Servicos LDA v. Virgin Enter. Ltd.*,
    511 F.3d 437 (4th Cir. 2007) ……………………………..……. ………13

*Sperberg v. Firestone Tire & Rubber Co.*,
    61 F.R.D. 80 (N.D. Ohio 1973) ……. ……………………………………..20

*Stolt-Nielsen S.A. v. Celanese A.G.*,
    430 F.3d 567 (2d Cir. 2005) …………….................................................. 1, 2

*United States v. Columbia Broadcasting Sys.*,
    666 F.2d 364 (9th Cir. 1982) …... ……………………………………26

*United States v. Nixon*,
    418 U.S. 683 (1974) ………………..……………………………………... 2

*United States v. Ryan*,
    402 U.S. 530 (1971) …………………………………............................... 1

## STATUTES AND RULES

28 U.S.C. § 1291 …………………………………………………………… 1

Fed. R. Civ. P. 4 …………………………………………………...……….. 14

Fed. R. Civ. P. 4(e) …………………………………………………...…………… 14

Fed. R. Civ. P. 4(h) …………………………………………………………… 14

Fed. R. Civ. P. 26 ……………………………………………………..… 21

Fed. R. Civ. P. 26(b)(2)(C) ………………………………………………… 18

Fed. R. Civ. P. 34 …………………………………………………….. 11, 28, 30

Fed. R. Civ. P. 34(a)(2) …………………………………………...………... 28

Fed. R. Civ. P. 45 …………………………………………………..10, 13

Fed. R. Civ. P. 45(a)(1)(A)(iii) ………………………………….……… 28

Fed. R. Civ. P. 45(a)(2)(C) …………………………………………..………….. 15

Fed. R. Civ. P. 45(b) …………………………………………………..…… 14

Fed. R. Civ. P. 45(b)(2)(A) …………………..……………………………….. 14

Fed. R. Civ. P. 45(c)(1) …………………………………………………... 25, 26

Fed. R. Civ. P. 45(c)(3)(A)(ii) ………………..………….. 10, 12, 13, 16, 17, 18

Md. Rule 2-124(d) ……………………………………………….……… 14

## MISCELLANEOUS

Moore's Federal Practice and Procedure, §20.04 …………………………… 17, 18

www.cassens.com/transport/employment.html ...................................................... 25

www.cassens.com/transport/terminallocations.html ............................................... 6

## STATEMENT OF JURISDICTION

Appellant, Cassens Transport Company (hereinafter "Cassens"), incorrectly asserts that this Court has jurisdiction over Cassens' appeal under 28 U.S.C. § 1291 and under the disinterested third-party exception to the finality rule. Appellant's Br. 1-2. As will be demonstrated below, neither 28 U.S.C. § 1291, nor the disinterested third-party exception, apply.

Under 28 U.S.C. § 1291, the appellate jurisdiction of the federal courts of appeals is limited to reviewing "all **final** decisions of the district courts" (emphasis added). The Court in *Cobbledick v. United States*, 309 U.S. 323 (1940), established that a district court's order denying a motion to quash a subpoena is generally not considered a "final decision" and is not immediately appealable. *Id.* at 328; *United States v. Ryan*, 402 U.S. 530, 532-34 (1971); *Reich v. Nat'l Eng'g & Contracting Co.*, 13 F.3d 93, 95 (4th Cir. 1993). Instead, one to whom the subpoena is directed "must either obey its commands or refuse to do so and contest [its] validity . . . if he is subsequently cited for contempt on account of his failure to obey." *Ryan*, at 532 (citing *Cobbledick*, at 327). The purpose of this rule is to discourage parties and witnesses from pursuing appeals from orders enforcing these subpoenas, "which would temporarily halt the district court's litigation process." *Reich*, at 95; *see Cobbledick*, at 327; *Ryan*, at 532-33. **This general rule applies whether the person attempting to quash a subpoena is a party to**

**the litigation or a non-party.** *Stolt-Nielsen S.A. v. Celanese A.G.*, 430 F.3d 567, 574 (2d Cir. 2005); *see United States v. Nixon,* 418 U.S. 683, 690-92 (1974); s*ee also Alexander v. United States,* 201 U.S. 117, 122 (1906).  Given Cassens has other recourse for challenging the District Court's Order, *i.e.* via a contempt proceeding should Cassens choose not to comply with the District Court's Order and later be cited for contempt,  a final decision with respect to the issue of the test load has not been rendered by the District Court.

Cassens additionally claims that this Court has jurisdiction based on the disinterested third party exception, which is known as the *Perlman* Doctrine. Appellant's Br. 2.  In *Perlman v. United States*, 247 U.S. 7 (1918), the Court reviewed a district court's order denying Perlman's petition to prohibit the production of documents owned by him at a grand jury proceeding, which were going to be used against him.  *Id.* at 9-10.  The Court rejected an assertion by the State that the order was interlocutory and nonappealable, stating that it would not accept the proposition that Perlman "was powerless to avert the mischief of the order."  *Perlman*, at 13; *Cobbledick*, at 328.  Accordingly, the *Perlman* doctrine provides that "a discovery order directed at a **disinterested** third party is treated as an immediately appealable final order because the third party presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance."

*Church of Scientology of Ca. v. United States,* 506 U.S. 9, 18 n. 11 (1992) (emphasis added).

The *Perlman* doctrine does not apply to Cassens, however, because Cassens can hardly be said to be a "disinterested" third party. Robert R. Lewis ("Mr. Lewis"), an employee of Cassens at its Jessup/Annapolis Junction, Maryland terminal, fell from the upper deck of a car carrier designed, manufactured, and sold by Cottrell, Inc. ("Cottrell") while in the course of his employment with Cassens, and ultimately died. JA 12-14, 98. Appellees, Joyce Lewis, individually and as personal representative of the Estate of Robert R. Lewis, Scott Lewis, and Tracey Chambers (hereinafter "Appellees"), subpoenaed Cassens, Mr. Lewis' employer and custodian of the car carrier that Mr. Lewis was operating on the day of his fatal fall (hereinafter the "Subject Carrier"), to produce the Subject Carrier – the subject of the underlying lawsuit – for inspection and test loading. JA 62-65. Certainly, when one considers that a valuable employee of Cassens was killed on the very car carrier that Appellees want to test, you would think that Cassens would be as interested in the findings as Appellees are. This is especially true since Cassens chooses to continue to have men work on the Subject Carrier without the OSHA-required railings. Maybe Cassens is "interested" for other reasons because Cassens does not want Cottrell to change its design because a design change may decrease

the speed of loading, *i.e.* the required railings would increase safety for Cassens' employees but decrease profits for Cassens.

Although Cassens argues that its involvement is limited to the issuance and compliance with the subpoena, considering the importance of the issues involved in the case (including the future safety of Cassens' employees), it is clear that Cassens possesses a significant stake in the outcome of this case. Appellant's Br. 2. As a result, the *Perlman* doctrine does not apply.

Notably, Cassens has blatantly failed to address the fact that this Court has already **denied** its Petition for Permission to Appeal because the District Court's July 29, 2013 Order does not constitute a final judgment and no exception to the final judgment rules applies under the circumstances. Sept. 20, 2013 Order, Doc. 9, Case No. 13-353. Moreover, Cassens' instant appeal is currently the subject of a Motion to Dismiss filed by Appellees on the same grounds upon which this Court previously denied Cassens' Request for Permission to Appeal. Appellee's Mot. to Dismiss, Doc. 10. Put simply, this Court does not need to address the merits of Cassens' appeal given that Cassens has improperly attempted to appeal from a non-appealable Order.

## STATEMENT OF THE CASE

Appellees brought a products liability action against Cottrell, alleging that the Subject Carrier was designed in such a way that it failed to incorporate

minimum safeguards to prevent against falls from the upper deck.   JA 9-38.

Counsel for Appellees served Cassens with a Subpoena for the test loading[1] of the

Subject Carrier, which is currently in the possession, custody, and control of

Cassens.  JA 62-65, 98.

Cassens filed a Motion to Quash the Subpoena (JA 67-97), which The

Honorable William M. Nickerson (hereinafter "Judge Nickerson") denied on July

29, 2013.  JA 176-79.  In response to the Order, Cassens noted its appeal on

August 28, 2013.  JA 202.  Cassens additionally filed a Petition for Permission to

Appeal on August 29, 2013, which this Court denied on September 20, 2013.  Sept.

20, 2013 Order, Doc. 9, Case 13-353.   Appellees filed a Motion to Dismiss

Cassens' Notice of Appeal for Lack of Jurisdiction on September 25, 2013, which

is still pending before this Court.  Appellee's Mot. to Dismiss, Doc. 10.

## STATEMENT OF THE FACTS

This case arises from a fatal fall that occurred on April 4, 2008.  JA 13-14.

Mr. Lewis, an employee of Cassens at its Jessup/Annapolis Junction, Maryland

---

[1] A test load will allow Appellees to load the same or substantially similar vehicles onto the upper deck of the Subject Carrier in the positions that they were in at the time Mr. Lewis was loading them as described by eyewitness, Tony Snyder, on the day of Mr. Lewis' fall.  It will demonstrate the type of footing that was available to Mr. Lewis after he had loaded the vehicles onto the top deck and what, if any, handhold devices were within his reach.  Appellees also intend to use the test load to simulate certain types of alternative safety designs (*i.e.* various railing systems) that Appellees contend Cottrell should have had in place on the car carrier used by Mr. Lewis on the day of Mr. Lewis' fall.

terminal, fell from the upper deck of a car carrier designed, manufactured, and sold by Cottrell while in the course of his employment with Cassens. *Id.* The Subject Carrier is currently in the possession, custody, and control of Cassens, Mr. Lewis' employer at the time of his fall and ultimate death. JA 98. It is Appellees' Subpoena served upon Cassens, wherein Appellees requested to test load the Subject Carrier at Cassens' Jessup/Annapolis Junction terminal, that is at issue. JA 62-65.

Even though the Subject Carrier is presently located in Aurora, Illinois, it is clear that the Subject Carrier was once located in Maryland – particularly, when it was operated by Mr. Lewis in Maryland. JA 12-13.

Additionally, even though Cassens contends that it does not own the Jessup/ Annapolis Junction terminal, it is undisputed that Cassens regularly conducts business there as the Jessup/Annapolis Junction terminal is listed on Cassens' website.[2] JA 10, 107. In fact, although Cassens maintains its corporate headquarters in Illinois, Cassens is also incorporated in Maryland and has availed itself of Maryland as a place to carry on regular business. JA 107. Cassens had previously allowed prior counsel to photograph the Subject Carrier at the Jessup/Annapolis Junction terminal on October 30, 2008, and Cassens did not raise

---

[2] See List of Cassens Terminals, available at http://www.cassens.com/ transport/terminallocations.html.

any issue about ownership of the terminal at that time. JA 70-71, 88-90, 110, 151, 160-61.

On June 18, 2013, Cassens filed a Motion to Quash the Subpoena. JA 67-97. On July 29, 2013, Judge Nickerson denied Cassens' Motion to Quash on the grounds that the 100-mile rule does not apply and that the subpoena was not unduly burdensome. JA 176-79.

On August 5, 2013, Counsel for Cassens sent a letter sent to Judge Nickerson, requesting a conference in chambers to discuss Cassens' compliance with Appellees' subpoena to test load the Subject Carrier. JA 180-81. In response thereto, Judge Nickerson instructed counsel for both parties to try to work out Cassens' issues with respect to the test load before seeking further court intervention. JA 182. In a good faith effort to try to quell Cassens' concerns about the subpoena for the test load, Appellees offered the following solutions:

- Appellees advised that they were willing to work with Cassens to schedule the test load at Cassens' terminal in Maryland for a mutually agreeable date and time, which would give Cassens ample time to make arrangements to mitigate the costs of having to comply with the subpoena and Cassens could possibly use the Subject Carrier to transfer goods toward the Mid-Atlantic region. JA 190.

- Appellees advised that they were willing to conduct the test load on a weekend, if a weekend date would be more amenable to Cassens.  JA 190.

- Appellees advised that they were willing to discuss their previous offer to indemnify Cassens for any damage to the car carrier caused by the test load.  JA 190.

- Appellees advised that they were willing to agree to a reasonable waiver of liability to be signed by anyone involved with the test load (*i.e.* expert, photographer, videographer, and/or counsel), releasing any claims for personal injury that may be sustained during the performance of the inspection and test load of the Subject Carrier.  JA 191.

- Appellees advised that they do not need any employees of Cassens present during the inspection and test load.  JA 190-91.

- Appellees also advised that the inspection and test load could be completed in one day (assuming an early start time).  JA 190.

Despite these proposals, Cassens raised new issues about the location of the test load, insurance to cover any damage that Cassens claims may be caused by the test load, and the qualifications of Dr. Gerald Micklow, the expert retained by Appellees to perform the test load.  JA 192-93.  It ultimately became clear that Cassens and Appellees would not be able to resolve Cassens' issues with respect to the subpoena and Judge Nickerson's Order denying Cassens' Motion to Quash on

their own and, therefore, Cassens again requested a conference in chambers with Judge Nickerson. JA 193.

On August 26, 2013, Appellees and Cassens participated in a conference call with Judge Nickerson to discuss outstanding issues regarding the test load of the Subject Carrier, which his Honor emphasized "has to get done." At that time, counsel for Appellees advised that, in an effort to address Cassens' new "roadblocks" about insurance and the qualifications of the person who would be conducting the test load, counsel had located an individual in Maryland who (1) loads car carriers, including various Cottrell-manufactured car carriers, on a daily basis as part of his business, (2) possesses a CDL license, and (3) has more than a million dollars available in insurance.[3] JA 205-06. During the conference call, Cassens asked that Appellees provide a detailed proposal of Appellees' plan for the test load and information for Appellees' contact in Maryland who is experienced with test loading Cottrell carriers and to advise whether that person will be able to make arrangements to conduct the inspection in Illinois.

Appellees were in the process of working on a reply to Cassens' requests when Cassens filed a Notice of Appeal on August 28, 2013. JA 205-06. Cassens

---

[3] Counsel for Appellees reached out to all of his business contacts in Maryland who had any connection to the car hauling industry (approximately 10 people) in order to try to resolve Cassens' issues with respect to the test load. Appellees additionally maintain that their expert, Dr. Gerald Micklow, is also qualified to perform the test load.

also filed a Petition for Permission to Appeal on August 29, 2013. Appellant's Pet. for Permission to Appeal, Doc. 2, Case No. 13-353.

Appellees submitted a response in opposition to the Petition for Permission to Appeal, arguing that the Court lacks jurisdiction to hear the appeal because (1) the Order is not a final judgment and does not fall under any exceptions, and (2) the Order does not constitute an affirmative injunction. Appellee's Opp'n to Pet. for Permission to Appeal, Doc. 8, Case No. 13-353. After reviewing the submissions by both parties, on September 20, 2013, Cassens' Petition for Permission to Appeal was **denied** by Judge Gregory with the concurrence of Chief Judge Traxler and Judge Floyd of this Court. Sept. 20, 2013 Order, Doc. 9, Case No. 13-353.

## SUMMARY OF THE ARGUMENT

First, Cassens is incorrect when it claims that the subpoena violates the 100-mile rule set out in Federal Rule of Civil Procedure 45(c)(3)(A)(ii). Despite the fact that the Subject Carrier is located more than seven hundred miles from the location of production, Rule 45 and case law make clear that the 100-mile limit applies only to travel by a subpoenaed person, and in this case, the subpoena was directed to Cassens who regularly conducts business in Maryland. JA 106-07, 176-77.

Second, compliance with the subpoena does not impose an undue burden upon Cassens. Cassens is well aware, via Appellees' extensive correspondence with Cassens, of (a) Appellees' offer to indemnify Cassens for any physical damage done to the car carrier during the test load, (b) Appellees' offer to have anyone involved with the test load (lawyers, experts, photographers, etc.) sign a reasonable waiver of liability for any personal injury sustained, and (c) Appellees' written assurance that that the person they have located to conduct the test load maintains over a million dollars in insurance coverage. JA 190-91, 205-06. Production of the Subject Carrier will not result in substantial financial harm as Appellees have provided Cassens with several options to allow Cassens to mitigate its costs of production. JA 190-91. Cassens' general statements that complying with the subpoena will result in "undue burden" do not provide the "overwhelming evidence" that is needed to warrant a reversal of Judge Nickerson's denial of Cassens' Motion to Quash.

Finally, the test loading proposed by Appellees is clearly contemplated by Rule 34 and will not subject the Subject Carrier to substantial damage, cause serious injury to the persons involved, and will not subject Cassens to liability.

As will be set forth in detail below, it is evident that the District Court did not abuse its discretion when it denied Cassens' Motion to Quash, and this Court should affirm the District Court's Order.

# ARGUMENT

### A. As a Preliminary Matter, the Fourth Circuit Court of Appeals Does Not Have Jurisdiction to Hear Cassens' Appeal.

As a preliminary matter, the Fourth Circuit does not have jurisdiction to hear Cassens' appeal. As set forth in the "Statement of Jurisdiction," Cassens has blatantly failed to address the fact that this Court has already **denied** its Petition for Permission to Appeal because the District Court's July 29, 2013 Order does not constitute a final judgment and no exception to the final judgment rules applies under the circumstances. See Appellee's Opp'n to Pet. for Permission to Appeal, Doc. 2, Case No. 13-353; Order, Doc. 10. Cassens' instant Appeal is the subject of a Motion to Dismiss Cassens' Notice of Appeal filed by Appellees on the same grounds. See Appellee's Mot. to Dismiss, Doc. 10, Case No. 13-2085. Appellees' Motion to Dismiss, which is still pending in this Court, should be granted on this jurisdictional ground. As a result, the merits of Cassens' appeal do not need to be considered by this Court.

### B. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because the 100-Mile Rule Does Not Apply.

The District Court did not abuse its discretion in denying Cassens' Motion to Quash Subpoena because even though the Subject Carrier is located more than 100 miles from the designated place for the test load at Cassens' Jessup/Annapolis Junction terminal, the 100-mile rule under Federal Rule of Civil Procedure

45(c)(3)(A)(ii) does not apply. Rule 45(c)(3)(A)(ii) specifically provides that a court must quash or modify a subpoena that:

> [R]equires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person.

Here, the subpoena was issued to Cassens, who although is a non-party, regularly transacts business in Maryland as it maintains a terminal in Maryland. JA 10, 62-65, 106-07, 176-77; *see also Rosenruist-Gestao E Servicos LDA v. Virgin Enter. Ltd.*, 511 F.3d 437, 445 (4th Cir. 2007) ("[T]he word 'person' in Rule 45 is not limited merely to 'natural persons' but includes juristic persons like corporations and governments as well.").

Commentary to Rule 45 explicitly states that "[a]s long as the subpoena is served on the subpoenaed person within the proper territorial range of the subpoena, it makes no difference that the materials sought are located beyond that range. Control of the documents or other things sought is the key, and if the entity servable locally has control, it must exercise that control to bring the materials in." Fed. R. Civ. P. 45, David D. Siegel Practice Commentaries, C45-6 (giving the example where a broad-based corporation present and served locally is required to produce records that it maintains at some distant place); JA 106, 177-78.

Although Cassens is incorporated and has its corporate headquarters in Illinois, Cassens is additionally incorporated in Maryland and the subpoena was

properly served on its Resident Agent in Maryland, in accord with Rule 45(b)(2)(A).[4]   JA 62-65, 106-07.   Cassens does not dispute that it conducts business in Maryland, particularly considering Cassens has a terminal in Jessup/Annapolis Junction.  JA 10, 107.  In fact, the Subject Carrier has previously been at the Jessup/Annapolis Junction location, because that is the location where Mr. Lewis' fall occurred.   JA 10-14.   Therefore, pursuant to the above-stated commentary, it does not matter that the subpoenaed carrier is located more than seven hundred miles away from the location designated for production in the subpoena because Cassens, who was served locally in Maryland, has control over the Subject Carrier.

Moreover, the case of *BNLfood Invs. Ltd. SARL v. Martek Biosciences Corp.*, 2012 U.S. Dist. LEXIS 104941 *1 (D. Md. July 27, 2012), which is cited by Cassens for the premise that a subpoena must be quashed or modified if it requires extensive travel is inapplicable to the case at bar.  Appellant's Br. 15.  *BNLfood*

---

[4] Cassens does not dispute that it was served properly with the Subpoena requesting to test load the Subject Carrier.  Since Rule 45(b) is silent with regard to what constitutes proper service of a subpoena upon a corporation, Courts have looked to Rule 4 for guidance.  *In Re Motorsports Merch. Antitrust Litig.,* 186 F.R.D. 344, 348-49 (W.D. Va. 1999) (internal citations omitted).  Pursuant to Rule 4(e) and 4(h), a party may serve a subpoena upon a corporation by personal service upon an officer or agent or pursuant to the law of the state in which the district court is located. In Maryland, service may be effected on a corporation by serving its resident agent.  Md. Rule 2-124(d).  Here, the Resident Agent for Cassens was personally served on June 4, 2013.  JA 62-65.  Therefore, service of the subpoena was proper.  JA 106.

involved two subpoenas issued to a non-party, which required the non-party to produce documents responsive to the subpoenas to counsel's office in Washington D.C. *Id.* at \*2. The non-party refused to comply with the subpoena, stating that the subpoena failed to comply with Rule 45(a)(2)(c), which states:

> A subpoena must issue as follows . . . for production or inspection, if separate from a subpoena commanding a person's attendance, from the court for the district where the production or inspection is to be made.

*Id.* at \*3. When the non-party refused to comply with the subpoenas, BNLfood filed a Motion to Compel. *Id.* Ultimately, the District Court for the District of Maryland denied the Motion to Compel, finding that the subpoenas were facially invalid because the subpoenas did not comply with the express mandate of Rule 45(a)(2)(c), which requires the subpoena to be issued from the Court where production is to be made. *Id.* In the instant case, as set forth above, the subpoena served upon Cassens' Resident Agent in Maryland for the production of the Subject Carrier was issued by a Maryland Court for production of the Subject Carrier in Maryland. JA 62-65.

Cassens also cites to the case of *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,* 262 F.R.D. 293 (S.D.N.Y. 2009), for the premise that **subpoenas served on individual employees** who reside outside of the geographic scope of Rule 45 must be quashed. Appellant's Br. 15. The key difference between the case cited by Appellant and the instant case is that, in the case cited by Appellant,

the subpoena at issue was served on an individual employee of the company, requesting that particular employee's attendance at trial.  As stated above, the subpoena at issue in this case was served on Cassens, not "an individual employee" of Cassens, and the subpoena asked Cassens to produce a tangible thing, *i.e.* the Subject Carrier, which is solely in the possession, custody, and control of Cassens. JA 62-65.

Appellant cites to *M'Baye v. New Jersey Sports Production, Inc.*, 246 F.R.D. 205 (S.D.N.Y. 2007), for the premise that because the Court found that the subpoenaed person in that case did not regularly transact business in New York, somehow this Court should find that Cassens does not regularly transact business in Maryland.  Appellant's Br. 15-16.  Cassens' argument is flawed.

In *M'Baye*, the defendants served a subpoena on a non-party, Frank Warren (hereinafter "Warren") to produce certain documents and to appear for deposition. *Id.* at 206.  When Warren failed to comply with the subpoena, the defendants filed a Motion to Compel. *Id.*  Warren cross-filed a Motion to Quash the subpoena. *Id.* The issue before the Court in *M'baye* was whether Warren's business qualified as the regular transaction of business under Rule 45(c)(3)(A)(ii), which specifies one must be doing business "in person" in a given location. *Id.* at 207.  Warren was a resident of the United Kingdom, and had traveled to New York on only four (4) occasions between November 2005 and April 2007 for a total of approximately ten

(10) days.  *Id.* at 206.  He also traveled to Philadelphia for three (3) days in 2005. *Id.*  All other business was conducted via telephone, e-mail, and fax between England, where Warren's office was located, and New York.  *Id.* at 207.  The Court found that the business transactions conducted by Warren via telephone, e-mail, and fax did not constitute "in person" transactions for the purposes of Rule 45(c)(3)(A)(ii).  The Court also found the in-person business Warren conducted in New York and Philadelphia (which is within a 100-mile radius of New York) was also insufficient to qualify as the regular transaction of business, stating, ". . . traveling to an area within a 100-mile radius for fourteen to eighteen days in two years is insufficient to render a person amenable to a subpoena."  *Id.* at 207-208. The circumstances of Cassens, in the case at bar, are entirely different than those of Warren in *M'Baye*.  Cassens is incorporated in Maryland maintains a terminal in Maryland where it carries out business regularly, which stands in complete contrast to the fourteen to eighteen days over a two year period that Warren conducted business within a 100 mile radius of New York.

### C. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because Compliance with the Subpoena and Order Does Not Impose an Undue Burden on Cassens.

### 1. Cassens' Claims of Undue Burden Fall Short.

The burden of proving that a subpoena is unduly burdensome is on the party requesting relief from the subpoena, and Cassens has not and will not be able to

meet this burden. *See* Fed. R. Civ. P. 45(c)(3)(A)(ii); 2-20 Moore's Federal Practice and Procedure § 20.04. While the court must limit the frequency or extent of discovery if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive" or if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues," Cassens has not demonstrated that such conditions exist. *See* Fed. R. Civ. P. 26(b)(2)(C). As a result, the District Court's Order mandating compliance with the subpoena must be upheld.

First, even though Cassens contends that it does not own the Jessup/Annapolis Junction terminal, it is undisputed that Cassens regularly conducts business there. JA 10, 107. Most significantly, Cassens even admitted in its opening brief that it previously allowed Appellees' prior counsel to photograph the Subject Carrier at the Jessup/Annapolis Junction terminal on October 30, 2008, without a court order, and Cassens did not raise any issue about ownership of the terminal at that time. Appellant's Br. 24.

Second, Appellees have provided Cassens with ample written assurances that it will be protected from liability in the event of injury to persons involved

with the test load or damage to the Subject Carrier resulting from the test load.[5]

Specifically, Appellees affirmed in their letter dated August 20, 2013 that they are

willing to indemnify Cassens for any damage to the Subject Carrier caused by a

test load  and that they will have everyone involved with the test load (lawyers,

experts, photographers/videographers, etc.) execute a reasonable waiver of

liability. JA 190-91.  Furthermore, Appellees have advised Cassens that Appellees

have located a qualified individual in Maryland to conduct the test load who (1)

loads car carriers, including various Cottrell-manufactured car carriers, on a daily

basis as part of his business, (2) possesses a CDL license, and (3) has more than a

million dollars available in insurance.  JA 206.

Third, Cassens' contention that it has "no knowledge of what the 'test

loading' simulation specifically entails" is disingenuous, at best.  Appellant's Br.

22.  Cassens has been in receipt of a detailed proposal for the test load since May

15, 2013 when undersigned counsel sent a letter to Counsel for Cottrell and

Counsel for Cassens specifically outlining the proposal for the test load.  JA 124-

126.  Appellees also outlined the details of the proposed test load in their Response

---

[5]  Parenthetically, Appellees maintain that the test load will not result in
damage to the Subject Carrier or personal injury to anyone involved.  Counsel for
Appellees plan to bring to the inspection and test load experts who are experienced
with test loading car carriers, which will alleviate the possibility of damage to the
Subject Carrier.  Moreover, the actions that Appellees intend to take in test loading
the Subject Carrier do not exceed the typical use of a car carrier – they plan to use
the Subject Carrier exactly how the product is intended to be used.  JA 111, 190-
91, 205-07.

to the Motion to Quash filed by Cassens, and again following the District Court's Order. JA 104, 205-06. Cassens' apparent need for more specific information is unfounded, and the federal rules and case law make clear that "each party is free to prepare and perform tests in the manner he deems best." *See Sperberg v. Firestone Tire & Rubber Co.*, 61 F.R.D. 80, 83 (N.D. Ohio 1973).

Finally, the production of the Subject Carrier in Maryland will not subject Cassens to substantial financial harm. Appellees are requesting that the Subject Carrier be produced at Cassens' terminal in Maryland. JA 62, 101-03, 182-86, 190. As previously stated, Cassens is incorporated in Maryland and has availed itself of Maryland as a location for its business. JA 10, 107. Cassens cannot now be heard to complain about having to drive its car carrier to Maryland in order to comply with the subpoena. JA 107. While Cassens' asserts that the Subject Carrier is subject to a tight delivery schedule and is assigned exclusively to the Illinois territory, Appellees have made clear that they are more than willing to work with Cassens to schedule the inspection and test load for a date and time that is agreeable to everyone involved, which will give Cassens ample time to make arrangements to mitigate the costs of having to comply with the subpoena.[6] JA 190. Cassens has been on notice since at least July 2013 that Appellees intended to

---

[6] One way for Cassens to mitigate the cost for this inspection and test load is to schedule the trailer for taking cargo to Maryland some time between now and the inspection. Cassens obviously scheduled the trailer to go from Maryland to its current location some time between the fall and today.

test load the Subject Carrier and of the possibility that the test loading would occur in Maryland, yet Cassens has refused to make any arrangements to mitigate the burden it claims it will sustain if forced to comply with the subpoena.  JA 62-65.

### 2. Any Undue Burden Claimed by Cassens is Significantly Outweighed by Appellees' Need for the Information to be Obtained from the Test Load.

Any monetary burden claimed by Cassens is significantly outweighed by Appellees' need for the information to be obtained from the test load, and the factors set forth in Rule 26 weigh in Appellees' favor in this regard.  That is, when considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action (including the future safety of Cassens' employees), and the importance of discovery in resolving the issues, it is clear that the District Court's Order must be upheld.  JA 108.

With regard to the need for the information, it is absolutely essential that Appellees test load the Subject Carrier in order to be able to demonstrate to a jury how the Subject Carrier was loaded and operated by Mr. Lewis on the day of his fall.  JA 108.  Unfortunately, due to his untimely death as a result of the fall from the Subject Carrier, Mr. Lewis is not available to testify in this case.  JA 12-14, 108.  Additionally, the test load of the Subject Carrier will allow Appellees to simulate the types of fall protection devices Appellees are claiming the Subject Carrier should have had.  JA 14-37, 108.  Since Mr. Lewis will be unable to testify

as to the conditions of the Subject Carrier he was loading at the time of his fall or provide commentary as to any fall prevention measures that could or should have been taken, Appellees will require extensive expert testimony to establish their case and this test load is one important aspect of the experts' opinions in this case. *Id.*

As to the importance of the issue at stake, this is a wrongful death products liability case where the decedent, Mr. Lewis, fell off the Subject Carrier that is the focus of this subpoena.  JA 14-37, 109.  Thus, the test loading of the Subject Carrier is central to proving the products liability claim at issue.  *Id.*  As this is a death case, the amount in controversy is substantial: Appellees are seeking five million dollars in compensatory damages against Cottrell in connection with the defective design of the Subject Carrier.  *Id.*

Furthermore, no alternative means to test loading the Subject Carrier exist. Cassens takes issue with Appellees' statement in their Response in Opposition to Cassens' Motion to Quash Subpoena that Appellees' desire to test load the Subject Carrier is "preferable rather than essential."  Appellant's Br. 23; JA 102, 150.  This issue raised by Cassens is a red herring.  However, for the sake of completeness, Appellees address this issue as follows:

In Footnote 5 of their Response in Opposition to Cassens' Motion to Quash, Appellees stated as follows:

Plaintiffs state that only one test load is necessary and that Plaintiffs' preference would be to test load the Subject Carrier that Mr. Lewis was loading on the day of his fall, which is in Cassens' custody and control. However, should Plaintiffs be precluded from test loading the Subject Carrier in Cassens' possession, Plaintiffs filed the Request for Production of a Tangible Thing requesting that Cottrell produce a car carrier of the same model as the Subject Carrier for test loading. A test load of the Subject Carrier or one of the same model that Mr. Lewis was loading on the day of this case is critical to understanding and evaluating the issues in this case, in particular, whether other safety devices (such as ladders, railing, or handholds) could have reasonably and feasibly been included on the upper deck of the Subject Carrier as a means of fall protection. Therefore, Plaintiffs are attempting to take all reasonable avenues to try to effectuate the test load.

JA 102. The context of this footnote is clear that a test load of the Subject Carrier is critical to the issues in Appellees' case, and that Appellees were simply making back-up arrangements in the event that their request to test load the Subject Carrier was denied. Appellees were not contending that the request to test load the Subject Carrier was not an "essential" request, and Appellees cannot be penalized for being thorough in their efforts to try to effectuate a test load (and to comply, in good faith, with Cassens request for Appellees to subpoena a similar car carrier from Cottrell for the test load).

Regardless, following service of the Request for Production of a Tangible Thing on Cottrell seeking production of a car carrier of the same model that Mr. Lewis was loading on the day of his fall, Cottrell advised Appellees that it does not have a car carrier of the model requested, and that "the fight on this will have to be

with Cassens." JA 101-02, 138-39. Therefore, the only way to feasibly obtain the most accurate information regarding Mr. Lewis' fatal is by inspecting and test loading the Subject Carrier from which he fell.

### 3. *Kostelecky v. NL Acme Tool/NL Industries, Inc.* and *In re Automotive Refinishing Paint Antitrust Litigation* are Inapposite.

As explained in Appellees' Opposition to Motion to Quash Subpoena, Cassens' analogy to the Eighth Circuit case of *Kostelecky v. NL Acme Tool/NL Indus., Inc.,* 837 F.2d 828 (8th Cir. 1988), fails to provide as much guidance as Cassens suggests on the issue of burden. Appellant's Br. 24-25; JA 109-10. In *Kostelecky,* the court quashed Plaintiff's subpoena, which had ordered Defendant to bring to trial tools similar to those used on the operation in which Plaintiff was injured. *Id.* at 832. The court explained that the burden and expense of transporting the tools to trial outweighed the benefit because similar tools had been previously been made available for inspection and presence of the tools at trial would not have assisted the jury. *Id.* at 832-33. The facts in *Kostelecky* are clearly distinguishable from those in this case. Here, Appellees are requesting to conduct a test load of the Subject Carrier, which has not yet been done, in preparation for trial in order to assist the jury in understanding the technical details of the case. JA 110. Appellees plan to videotape the test load, which will be shown to the jury since they will likely be unfamiliar with the practice of test loading car carriers and will not have the benefit of testimony from Mr. Lewis. *Id.*

Additionally, Cassens' comparison to the court's decision in *In re Automotive Refinishing Paint Antitrust Litigation*, 229 F.R.D. 482 (E.D. Pa. 2005), is also misplaced. Appellant's Br. 25-27. In that case, the court found that subpoena subjected the non-party, a foreign entity with a staff of only eight employees, to undue burden primarily because the subpoena requested a broad range of documents, electronic files and e-mails (from 1990 through 2005) and would require contracting with information technology professionals and providing the assistance of at least one of its eight employees. *In Re Automotive Refinishing Paint,* at 495-96. Here, the subpoena requested the inspection and test loading of a single, specific car carrier from a company that employs over 1,700 drivers, shop personnel and support people.[7] Notably, Appellees advised Cassens in an August 12, 2013 letter and again in an August 20, 2013 letter to Judge Nickerson on which counsel for Cassens was copied, "Plaintiffs do not **need** any employees of Cassens present during the inspection and test load." JA 190-91.

### 4. Judge Nickerson's Decision to Not Make Appellees' Reimburse Cassens for the Costs Associated with the Test Load is not an Abuse of Discretion.

Even though Cassens requested in its Motion to Quash that the Court order Appellants to pay reasonable attorney's fees and costs pursuant to Rule 45(c)(1), Judge Nickerson was not required to order same. JA 68, 77. Rule 45(c)(1)

---

[7] See Cassens' Employment Information, available at http://www.cassens.com/transport/employment.html.

mandates that the issuing court impose sanctions, including reasonable attorney's fees, **only on a party who fails to take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena**.     Here, as outlined throughout the instant brief, Appellees have made numerous offers to Cassens to try to mitigate any burden caused to Cassens by virtue of the test load and, therefore, sanctions upon Appellees are not warranted.  JA 107-08, 190.

Additionally, the court in *United States v. Columbia Broadcasting Systems*, 666 F.2d 364 (9th Cir. 1982), discussed four factors which district courts consider for awarding costs to non-parties: (1) the scope of discovery; (2) the invasiveness of the request; (3) the extent to which the producing party must separate responsive information from privileged or irrelevant material; and (4) the reasonableness of the costs of production.  *Id.* at 371-72 n. 9.  Taking each of these factors in turn, it is clear that Judge Nickerson did not abuse his discretion by choosing not to award costs to Cassens for compliance with the subpoena.

In this case, the scope of subpoena was limited to one (1) tangible thing, the Subject Carrier. JA 62-65.  Appellees' request was not invasive because it did not require Cassens' to perform any extensive searches for materials – *i.e.* it did not require Cassens to search for the proverbial "needle in a haystack."  Cassens knows the particular car carrier involved, given the fact that Cassens previously made said car carrier available to Appellees' former counsel so that it could be

photographed (and Cassens did so even without a subpoena or court order). JA 70-71, 110, 151, 160-61. Appellees' request does not seek any privileged or confidential information, nor has Cassens alleged in any of its pleadings to date that it is not producing the Subject Carrier based on a claim of privilege or confidentiality. Lastly, the costs of the production are reasonable because Cassens is "interested" in the outcome of the litigation. JA 108. Cassens is Mr. Lewis' employer and the custodian of the car carrier Mr. Lewis was operating on the day of his fatal fall. JA 10. Appellees have alleged that safer design alternatives were available to Cottrell, and this certainly has an effect on the employees of Cassens who load these Cottrell trailers on a daily basis. JA 12-37. One might argue that the legal fees that Cassens is spending to fight the subpoena far exceed the $10,000-$15,000 estimate Cassens' attorney has given for the cost to comply with the Subpoena by bringing the Subject Carrier back to Maryland (its former home location). JA 74, 83-84, 107-08. The filing fee alone was $455. JA 8, entry #58. Also, as discussed throughout, Appellees have provided Cassens with several options to mitigate the costs of compliance with the subpoena. JA 107-08, 190.

Since Cassens remains unable to meet the heavy burden of proving that compliance with the subpoena imposes an undue burden, this Court should uphold the District Court's Order mandating that the inspection and test loading of the Subject Carrier occur in Maryland.

**D. The District Court Did Not Abuse its Discretion in Denying Cassens' Motion to Quash Subpoena Because Rule 34 Clearly Contemplates the Test Loading Sought by Appellees.**

Finally, the District Court did not abuse its discretion when it denied Cassens' Motion to Quash Subpoena because the test loading contemplated by Appellees is clearly allowed under Rule 34.  In addition to producing designated documents and/or permitting the inspection of premises, Rule 45 permits testing of a non-party's property in accordance with Rule 34, which permits a requesting party to "inspect, measure, survey, photograph, **test**, or sample the property or any designated object or operation on it."  Fed. R. Civ. P. 45(a)(1)(A)(iii), 34(a)(2) (emphasis added).

Test loading the Subject Carrier will not "create a risk of injury to person and damage to property, [nor] expose Cassens to substantial liability without adequate liability protection."  Appellant's Br. 29-30.  The Notes of the Advisory Committee on Rule 34 make clear:

> The inclusion of testing and sampling of tangible things and objects. . . reflects a need frequently encountered by parties in preparation for trial.  If the operation of a particular machine is the basis of a claim for negligent injury, it will often be necessary to test its operating parts or to sample and test the products it is producing.

*See In re Air Crash Disaster at Sioux City*, 1991 U.S. Dist. LEXIS 10372 *1, *3 (N.D. Ill. July 26, 1991) (quoting Fed. R. Civ. P. 34, Notes of Advisory Committee, 1970 Amendment).  The fact that the Subject Carrier allegedly

contains a dangerous defect provides even further support under this commentary that test loading is within the scope of the rule.[8]

Additionally, the facts in *In re Air Crash Disaster* are distinctly different than those in this case. Supporting a protective order prohibiting a proposed simulation of the air crash, the court in *In re Air Crash Disaster* discussed the simulation's "potential disadvantages" – (1) the plan to shut down certain engines and manipulate the throttles to re-enact the circumstances leading up to the crash may subject the flight crew to danger; (2) it would not be used to prove liability but only to prove damages for pain and suffering; (3) it was not essential to plaintiffs' cases because plaintiffs were able to use other evidence to explain to the jury emotional distress; and (4) the subpoenaed party provided a list of companies that purportedly rent or lease aircrafts, thereby providing plaintiffs' with a less burdensome alternative. *Id.* at *6-7 (numbering added). Here, Appellees plan to

---

[8] As stated in Appellees' Opposition to Cassens' Motion to Quash Subpoena and included as Exhibit 10 thereto, test loading of car carriers is not a new and novel idea. It is exactly what Cottrell's in-house expert and head of design, Phillip Bryan Howes, says he does when evaluating fall prevention and safety alternatives. At page 11 of Phillip Bryan Howes' September 8, 2010 deposition, he indicates that his fall prevention experience is from test loading the equipment. See Pertinent Portions of Phillip Bryan Howes' Deposition Transcript, included in the Addendum. At page 41, Mr. Howes states that he determines the feasibility of handholds by test loading or CADS. See Addendum; JA 104. Although Cassens included Exhibit 10 in their initial Joint Appendix, Exhibit 10 is omitted from the most recent Joint Appendix and, is therefore, included in the Addendum attached hereto. JA 141-42.

operate and load the Subject Carrier in the same manner Mr. Lewis or any other driver would operate a carrier. JA 111, 190-91, 205-07.

Test loading the Subject Carrier is necessary to proving Cottrell's liability for designing a car carrier with a dangerous design defect. As stated previously, it is essential that Appellees be able to test load the Subject Carrier to be able to demonstrate to a jury how the Subject Carrier was loaded and operated by Mr. Lewis on the day of his fall and to simulate the types of fall protection devices Appellees are claiming the Subject Carrier should have had, particularly considering the fact that Mr. Lewis will be unable to testify in this case. JA 110. Finally, no less burdensome alternatives exist; Appellees have been unsuccessful in obtaining a similar carrier from Cottrell and in finding a company with carriers available for rental or lease despite numerous attempts. JA 107-110. Since the ability for Appellees to test load the Subject Carrier is clearly contemplated by Rule 34, Cassens is incorrect in arguing that the Court abused its discretion when it refused to quash Appellees' subpoena on this ground.

## CONCLUSION

The District Court did not abuse its discretion in denying Cassens' Motion to Quash. Appellees, therefore, request that this Court uphold the District Court's July 29, 2013 Order and enforce the subpoena mandating the inspection and test loading of the Subject Carrier at the Jessup/Annapolis Junction in Maryland.

## REQUEST FOR ORAL ARGUMENT

Appellees respectfully request that this Court schedule this matter for oral argument.

Respectfully submitted,
/s/ Ray M. Shepard
Ray M. Shepard (Bar No. 09473)
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, MD 21204
(410) 821-0070
(410) 821-0071 (facsimile)
rshepard@sgs-law.com
*Attorney for Respondents*

November 18, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2013, copies of the foregoing Appellees' Brief was filed electronically.  Notice of this filing will be sent to all parties in this case by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

November 18, 2013                    /s/ Ray M. Shepard

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>13-2085</u>    **Caption:** <u>Cassens Transport Company v. Joyce Lewis, et al.</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word-processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [✔] this brief contains _____ 7,644 _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [✔] this brief has been prepared in a proportionally spaced typeface using
    <u>Microsoft Word</u> [*identify word processing program*] in
    <u>14 pt. font, Times New Roman</u> [*identify font size and type style*]; **or**

    [ ] this brief has been prepared in a monospaced typeface using
    _____ [*identify word processing program*] in
    _____ [*identify font size and type style*].

(s) <u>_Kay Shepard_</u>

Attorney for <u>Joyce Lewis, et al., Appellees</u>

Dated: <u>11/18/2013</u>

Addendum

Thompson v Cottrell

## Page 1

```
 1              IN THE CIRCUIT COURT
                THIRD JUDICIAL CIRCUIT
 2              MADISON COUNTY, ILLINOIS
 3    JOHN THOMPSON and                )
      JACQUELINE M. THOMPSON,          )
 4         Plaintiffs,                 )  CIVIL ACTION FILE
                 vs.                   )
 5    COTTRELL, INC., and              )  NO. 09-L-1067
      AUTO HANDLING CORP.,             )
 6         Defendants.                 )
 7          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS
 8
      GARY SMITH and DIANA            )
 9    SMITH,                          )  CIVIL ACTION FILE NO.
           Plaintiffs,               )
10               vs.                  )  3:09-CV-00692-WDS-DGW
      AUTO HANDLING CORP.,            )
11    et al.,                        )
           Defendants.               )
12
13      IN THE CIRCUIT COURT THIRD JUDICIAL CIRCUIT
                MADISON COUNTY, ILLINOIS
14
      MICHAEL MANDEVILLE and          )
15    DIANE MANDEVILLE,               )  CIVIL ACTION FILE
           Plaintiffs,               )
16               vs.                  )  NO. 07-L-263
      COTTRELL, INC., and             )
17    CASSEN & SONS, INC.,            )
      INTERNATIONAL TRUCK and         )
18    ENGINE CORPORATION,             )
           Defendants.               )
19
                 DEPOSITION OF
20              PHILLIP BRYAN HOWES
21              SEPTEMBER 8, 2010
                    9:30 A.M.
22
                200 S.E. BUTLER PARKWAY
23              GAINESVILLE, GEORGIA
24
                JUDY J. SMITH, RMR
25                  CCR-A-521
```

## Page 2

```
 1                    INDEX
 2
 3    PLAINTIFF'S EXHIBIT              PAGE
 4
 5            1                         43
 6    Handdrawn Diagram
      One page
 7
 8            2                         79
 9    Letter, Ellis to Bull
      May 21, 2006
10
11            3                         84
12    Document Titled
      Ellis Railgrabber Issues
13
14            4                        114
15    Customer Letter Regarding
      Additional Features Available
16    Immediately for All Cottrell
      Equipment
17
18            5                        120
19    Amended Notice of Deposition
      Bryan Howes and 30(b)(6)
20
21            6                        184
22    Change Package Report
      Change Number ER-013575
23
24            7                        214
25    Photocopy of Photograph
```

## Page 3

```
 1    PLAINTIFF'S EXHIBIT              PAGE
 2
 3            8                        215
 4    Handwritten Notes
      One Page
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1    APPEARANCES OF COUNSEL:
 2
 3    On behalf of the Plaintiffs:
 4      CHARLES W. ARMBRUSTER, III, Esq.
        Armbruster, Dripps, Winterscheidt &
 5      Blotevogel, LLC
        219 Piasa Street
 6      Alton, Illinois 62002
        (800) 917-1529
 7      charles@adwblaw.com
 8    On behalf of the Plaintiffs
 9      Michael Mandeville and
        Diane Mandeville:
10      BRIAN WENDLER, Esq.
11      Wendler Law Firm, P.C.
        900 Hillsboro, Suite 10
12      Edwardsville, Illinois 62025
        (618) 692-0011
13      wendlerlaw@yahoo.com
14
15      On behalf of the Defendant Cottrell, Inc.:
16
        DANIEL J. CARPENTER, Esq.
17      Armstrong Teasdale, LLP
        7700 Forsyth Boulevard
18      Suite 1800
        St. Louis, Missouri 63105
19      (314) 621-5070
        dcarpenter@armstrongteasdale.com
20
21      MELANIE S. STONE, Esq.
        Cottrell, Incorporated
22      2125 Candler Road
        Gainesville, Georgia 30507
23      (678) 677-8285
        mstone@cottrelltrailers.com
24
25
```

CONFIDENTIAL

EXHIBIT

10

page 1

Thompson v Cottrell

Page 9

1    Q.   Tell me about your education, please.
2    Where did you go to college?
3    A.   I went to Georgia Institute of
4    Technology, graduated in 1983 with a bachelors
5    degree in engineering science and mechanics.
6    Q.   Bachelors in engineering science and
7    mechanics, did you say?
8    A.   That's correct.
9    Q.   So it's different than an engineering
10   degree in the traditional sense of a
11   mechanical engineer or an electrical engineer?
12   A.   No, not at all.
13   Q.   It's the same thing?
14   A.   It's very similar.
15   Q.   What's the difference between, say, a
16   mechanical engineer and a person with your
17   degree?
18   A.   Well, the best way I can phrase it is
19   the way my faculty advisor explained it to me
20   one day, a person with an engineering science
21   and mechanics degree is a classy mechanical
22   engineer.
23      It's a little more rigorous.   It's a
24   little more based in mechanics, strength of
25   materials, some of the basics of engineering

Page 10

1    than mechanical engineering is.
2    Q.   Have you had any post-graduation
3    education in the field of engineering?
4    A.   I've taken some continuing education
5    courses over the years.
6    Q.   Are you required to take any certain
7    number of continuing education courses to
8    maintain a certificate or license of any kind?
9    A.   No, I am not.
10   Q.   So any continuing education courses
11   you took were voluntary on your part?
12   A.   That's correct.
13   Q.   What sort of things have you studied
14   in these continuing education courses?
15   A.   I believe I took a course in data
16   acquisition.   I took a course in hydraulics.
17   There's a couple of others that escape me
18   right now, but those are among the ones I've
19   taken.
20   Q.   Ever taken any courses either in
21   college or as a continuing education course in
22   the field of fall prevention?
23   A.   In the field specifically of fall
24   prevention?
25   Q.   Yes.

Page 11

1    A.   No.
2    Q.   Have you had any education
3    tangentially in the field of fall prevention?
4       MR. CARPENTER:  Object to form.
5       THE WITNESS:  I'm not sure I
6    understand what you mean.
7    BY MR. ARMBRUSTER:
8    Q.   Have you taken any courses that,
9    although that wasn't their main focus, they
10   did deal with the topic of fall prevention?
11   A.   Got a lot of experience working with
12   that but no formal courses, no.
13   Q.   What experience do you have working
14   with fall prevention?
15   A.   Well, it's mainly in the line of
16   actually test loading on equipment.
17   Q.   Any other experience in fall
18   prevention other than what you've learned from
19   test loading?
20      MR. CARPENTER:  Object to form.
21      THE WITNESS:  No, I have no formal
22   experience.
23   BY MR. ARMBRUSTER:
24   Q.   And what sort of experience have you
25   received in fall prevention by virtue of test

Page 12

1    loading?
2    A.   Well, on our rigs it would be, you
3    know, where we need steps, where we need
4    hand-holds, things of that nature.
5    Q.   And how is that determined during
6    test loading?
7    A.   It's determined by actually putting
8    the vehicles in the position they're going to
9    be in, getting in and out of the vehicles,
10   climbing up and down to those vehicles.
11   Q.   During the test loading, are you
12   actually loading the vehicles or are you
13   watching someone else load the vehicles?
14   A.   I've done it both ways.
15   Q.   When is the last time you personally
16   test loaded a vehicle?
17   A.   About four months ago.
18   Q.   What were you test loading?
19   A.   We were test loading a new trailer.
20   Q.   What sort of cars were you putting on
21   the trailer?
22   A.   In this case they were primarily
23   Toyota product.
24   Q.   Smaller Toyotas, the cars or the
25   larger trucks?

Thompson v Cottrell

Page 41

```
 1   space or area for them to put their foot on?
 2       A.   Well, again, it's typically, if it's
 3   mounted on a deck, it's an extension, a
 4   widening of the deck, if you will.
 5       So it's whatever that original deck surface
 6   is plus the additional amount that we've
 7   added.
 8       Q.   You talked about appropriate and
 9   feasible in terms of catwalks.   What about in
10   terms of hand-holds, what do you mean when you
11   talk about the location of a hand-hold being
12   appropriate and feasible?
13       A.   Well, is it in the natural path that
14   would be required for egress and ingress, if
15   you will, into the rig.   You want to make
16   sure it also doesn't get into a door opening,
17   as well.
18       So we've got to make sure that we've got it
19   located to where it meets both those
20   requirements.
21       Q.   And how did you determine where it
22   would be appropriate and feasible to put a
23   hand-hold?
24       A.   Either through test loading or
25   through physical layout on our CAD system.
```

Page 43

```
 1   BY MR. ARMBRUSTER:
 2       Q.   So when you talk about a hand-hold,
 3   are you envisioning a specific piece of
 4   equipment that has a specific design and
 5   appearance?
 6       A.   Most of the time, yes, but not 100
 7   percent of the time.
 8       Q.   Most of the time, what does a
 9   hand-hold look like?
10       A.   Most of the time it's a
11   channel-shaped piece of bar stock.   I say
12   channel or hat-shaped piece of bar stock.
13            MR. CARPENTER:   Did you say
14   hat-shaped?
15            THE WITNESS:   Yes.
16   BY MR. ARMBRUSTER:
17       Q.   I'm going to give you a piece of
18   paper and ask you to sketch a hand-hold for
19   me.
20       A.   That would be like a cross-section of
21   a typical hand-hold but not by any means all
22   hand-holds?
23       Q.   We will put an exhibit sticker on
24   this.   I will refer to it as Exhibit 1.
25            (Exhibit 1 was
```

Page 42

```
 1            MR. CARPENTER:   When you're
 2   talking about hand-holds, are you including
 3   rails?   I think we've used them
 4   interchangeably.   Maybe I'm wrong.
 5            MR. ARMBRUSTER:   I guess we should
 6   get the terms locked down.
 7   BY MR. ARMBRUSTER:
 8       Q.   You said grab bars earlier.
 9       A.   Okay.
10       Q.   Is grab bar, in your parlance, the
11   same as a hand-hold?
12       A.   No.
13       Q.   What's the difference between a grab
14   bar and a hand-hold?
15       A.   Well, a grab bar would be typically a
16   stand-alone upright, if you will.
17       It's a stand-alone upright that you can use
18   at the top of your steps to grab onto.   A
19   hand-hold might be a piece of rod or a stamped
20   part that is attached to some other structure
21   on the rig, although you could use a grab bar
22   as a hand-hold?
23            MR. CARPENTER:   Can a grab bar
24   have a hand-hold on it?
25            THE WITNESS:   It could.
```

Page 44

```
 1            marked for identification.)
 2   BY MR. ARMBRUSTER:
 3       Q.   Exhibit 1 is the diagram you just
 4   drew for us?
 5       A.   Yes, it is.
 6       Q.   And you sketched a hand-hold.   We're
 7   looking at a cross-section of a piece of
 8   steel?
 9       A.   That's correct.
10       Q.   Does this steel serve any purpose
11   other than being a hand-hold?
12       A.   I can't think of any dual purpose.
13       Q.   If we were to look at this piece of
14   steel that you're calling a hand-hold from the
15   top, how wide would it be?
16       A.   I think it's about one inch.
17            MR. CARPENTER:   Do you have any
18   rig photos?
19            MR. ARMBRUSTER:   I did not bring
20   any rig photos that would show this that I
21   know of.
22   BY MR. ARMBRUSTER:
23       Q.   So the hand-hold would be one inch
24   wide if you're looking at it from the top?
25       A.   Uh-huh.
```